25 C.C.P.A.(Patents)

## In re CRABBS.
### Patent Appeal No. 3926.

Court of Customs and Patent Appeals.
June 6, 1938.

George W. Mills, Jr., of Lockland, Ohio (Albert F. Robinson, of Lockland, Ohio, of counsel), for appellant.

R. F. Whitehead, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Primary Examiner rejecting claims 4 to 9, inclusive, and 16 to 22, inclusive, in appellant's application for a patent for an alleged invention relating to improvements in asbestos cement shingles.

Claims 6 and 21 are illustrative of the appealed claims. They read:

"6. In an asbestos cement shingle a body having an exposable surface formed of ridges and intervening furrows, said ridges and furrows being irregular in height and irregular in depth, the shingle being of greater density in the portions underlying the furrows than in the portions underlying the ridges, the undersurface of said shingle being arranged in substantially the same plane."

"21. In an asbestos cement strip, a body portion of substantial thickness, a relatively plane undersurface and a top surface with exposable portion thereof provided with irregularly arranged ridges and intervening irregularly arranged furrows predominantly longitudinally disposed, thereby providing an exposed surface simulating a weather aged appearance."

The references relied upon by the tribunals of the Patent Office are: Scharwath et al., 1,404,483, Jan. 24, 1922; Perry, 1,451,369, Apr. 10, 1923.

It will be observed from the appealed claims that appellant's shingle has a relatively plane undersurface, and a top surface provided with "irregularly arranged ridges and intervening irregularly arranged furrows predominantly longitudinally disposed." The exposed surface of the shingle simulates a weather-aged appearance.

Appellant stated in his application that, due to efflorescence, the free lime in asbestos cement shingles rises to the surface and causes discoloration; that by breaking up the surface of the shingle into irregular ridges and longitudinal grooves, such discoloration is greatly counteracted; that, due to the "irregular heights and depth of the ridges and furrows, * * * shadows of different intensities" are created, giving the shingle a "weather aged effect"; that the free lime tends to gather in the longitudinal grooves, leaving the ridges or elevations substantially free from such deposits; and that the shadows caused by the ridges appear in the valleys, preventing, to some extent, the visibility of the lime deposits.

Appellant's shingles are made by subjecting smooth-surface shingle blanks to a die press, whereby the density of the material in the recessed portions is increased. In other words, the shingles are so made that the depressed or recessed portions have "densified reinforcing."

The patent to Scharwath et al. discloses a press-molded asbestos cement shingle having its exposed upper surface "ribbed or corrugated." The patentees stated that the exposed upper surface of their shingle was "broken by a plurality of substantially parallel longitudinally extending ridges * * * and by substantially transversely extending parallel curved intersecting ridges * * *, of comparatively small height * * * merely * * * sufficient to make pronounced markings or roughening of the surface," and that one of the objects of their invention was to prevent glare, ordinarily present in roofs composed of "artificial shingles." This patent does not teach that the recessed portions in the patentees' shingles should be reinforced by making them more dense.

Both of the references relied upon in this case were before us in the case of In re Smolak and McQuade, 88 F.2d 838, 24 C.C.P.A., Patents, 1132. We there described the patent to Perry as follows (page 840):

"The patent to Perry relates to a strip shingle in which a substantially homogeneous material is used. In his specification the patentee states that 'the impressions are in the main or body portion of the construction strips, which has distributed therethrough the fibrous material, and which is of a homogeneous material capable of receiving and permanently retaining impressions of the desired sort and not merely in any superficial coating on such strips'; that the depressions or grooves may be either straight or curved, and may be of any desired shape, depth, or width; that, 'It is, of course, to be understood that in the articles which are the object of my invention the depressions are deep enough to provide of and by themselves the desired appearance of separate unit shingles or tiles without in any way relying on the use of pigmenting or similar materials of various classes to produce the desired effect.' After giving various examples, the patentee states that 'Any other desired form of groove or depression may be used'; that they may 'be *made by pressing the strip between rolls having projections corresponding to the depressions desired,*' or they may 'be made by hand or in any other feasible manner'; *and that the depressed or corrugated portions, being of increased density 'due to their having been compressed, act as mechanical strengthening members.*'" (Italics not quoted.)

The patent to Perry teaches the advisability of reinforcing the sections beneath the depressions or corrugations by increasing their density precisely as does appellant. Furthermore, the patentee suggested that any form of groove or depression might be used, and that they might be formed by *pressing the strip or shingle between rolls having proper projections and corresponding depressions*. The patentee further stated that the depressions or grooves might be either straight or curved, and of any desired shape, depth, or width.

Neither of the references, however, shows the precise design called for in the appealed claims.

It is argued by counsel for appellant that the "substantially transversely extending parallel curved intersecting ridges," disclosed in the Scharwath et al. patent would prevent proper drainage, and that discoloration of the patentees' shingles would result.

The Primary Examiner stated in his decision that the longitudinal grooves in appellant's shingle "are discontinuous with each other and in most instances surrounded by ridges." The examiner was evidently of opinion that there was no great difference, so far as the matter of drainage is concerned, between the Scharwath et al. shingle and appellant's shingle, although he stated that "In spite of the advantages of appearance, drainage, and lime collecting applicant alleges his shingle obtains over the art, his claimed structure is not believed to be patentable." The examiner further stated:

"Appearance may be changed at will without invention. *Drainage does not appear to be a material problem,* especially as shingles are always laid at an angle to the horizontal, and applicant's grooves do not appear to be especially designed to create drainage channels but merely perform that function incidentally. The lime collecting feature would exist in any grooves, for example, those of Scharwath, and applicant's design thereover merely produces irregular grooves. To produce an irregular appearance so as to conceal defects, etc. is considered but design skill and not mechanical improvement." (Italics ours.)

It is obvious from an examination of the drawings in appellant's application that the longitudinal grooves in his shingle are frequently interrupted by ridges. Those ridges must necessarily tend to prevent rather than promote proper drainage. It may be that they do not interfere with the free flow of water to the same degree and extent as do the transverse ridges in the Scharwath et al. shingle; nevertheless, as hereinbefore noted, the patent to Perry plainly states that a shingle of the type there disclosed might have corrugations of any desired shape, depth, or width. Furthermore, although counsel for appellant argues that the longitudinal grooves in appellant's shingle tend to promote drainage and that appellant's shingle has utility in that respect, and although a similar view is expressed in the affidavit of one Harold W. Greider (a research chemist, engaged in research work in connection with asbestos-cement, and asphalt, roofing materials), no such claim is made in appellant's application. It is further argued by counsel for appellant that the patent to Perry is from a nonanalogous art, and that, therefore, it can not be combined with the patent to Scharwath et al. for the purpose of negativing patentability of the appealed claims.

█ If the patent to Perry is from a nonanalogous art, the contentions made by counsel for appellant in that regard are sound. In re Reichel, 84 F.2d 221, 23 C.C. P.A., Patents, 1293.

It is true, as argued by counsel for appellant, that Perry's shingle was made of a base consisting of roofing felt or similar material saturated with waterproofing substances, coated with asphalt or its equivalent, and then given a surface coating of a crushed mineral substance, such as slate, mica, or sand; whereas, appellant's application calls for shingles made of asbestos fiber and cement; nevertheless, the patent to Perry relates to the art of making shingles, and specifically teaches that any homogeneous material *"capable of receiving and permanently retaining impressions of the desired sort"* might be used. (Italics ours.)

█ Accordingly, we are of opinion that the Perry patent is not from a nonanalogous art, and that, upon reading that patent, it would be obvious to one skilled in the art that corrugations and ridges of any desired shape or depth might be formed, by compression, in a shingle composed of asbestos fiber and cement, and that the density of the material in the recessed portions could be increased by such compression. See In re Christian L. Schneider, 47 F.2d 970, 18 C.C.P.A., Patents, 1114; In re Ra-

leigh, 62 F.2d 200, 20 C.C.P.A., Patents, 751. In so holding, we are not unmindful of the fact that so-called "asphalt roofing" and "asbestos-cement roofing" are made by different processes and on different machines, and that manufacturers of those two types of roofing are confronted with different problems with regard to "resisting weather conditions," as stated in the affidavit of Harold W. Greider.

In the Smolak and McQuade Case, supra, this court considered the patentability of a shingle, which was defined in one of the claims there involved as follows:

"21. A preformed non-inflammable structural unit, adapted for use as a siding slab, shingle, and the like, consisting chiefly of asbestos fibers and Portland cement and including, on the face thereof, elevated portions extending in irregularly longitudinal manner and to irregularly varying elevations, depressed portions alternating with the elevated portions and extending in irregularly longitudinal manner and to irregularly varying depths, and intermediate portions of irregularly sloping surfaces defined between the said elevated and depressed portions, whereby the unit is adapted to reflect light in diffuse manner" and held, in view of the references (particularly the patent to Perry) here involved, that—

"It being old to make press molded fireproof shingles by combining asbestos fibers and cement, the exposed surfaces of the shingles having indentations, corrugations, or grooves, thereby preventing the glare ordinarily present in roofs composed of artificial shingles, and it being old, as taught by the Perry disclosure, to make strip shingles of homogeneous material, and to form corrugations therein of *any desired shape or depth by compression,* we are of opinion, as was each of the Patent Office tribunals, that the appealed claims are not patentable over the prior art." (Italics not quoted.)

The similarity between claim 21 involved in the Smolak and McQuade Case, supra, and the claims now before us is obvious. We are of opinion that the involved claims are not patentable over the references, and that the tribunals of the Patent Office reached the right conclusion.

The decision of the Board of Appeals is affirmed.

Affirmed.